805 F.2d 1035
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Herman E. MARTIN, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 85-1828.
 United States Court of Appeals, Sixth Circuit.
 Oct. 23, 1986.
 
 Before JONES, MILBURN and BOGGS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Claimant Herman E. Martin appeals from the district court's grant of the Secretary of Health and Human Services' (Secretary's) motion for summary judgment, affirming the Secretary's denial of a period of disability, disability insurance benefits (DIB), and supplemental security income (SSI) benefits. On consideration of the briefs and record, we affirm.
 
 I.
 
 2
 Claimant was 37 years old at the time of his administrative hearing, stood six feet tall and weighed 168 pounds. He graduated from high school and had worked for ten and one-half years prior to his injury as a heavy equipment operator. Before that he had worked in a factory, doing both piece work and line work. Claimant testified that he looked for jobs but had not worked since he fractured his left patella in an automobile accident on December 21, 1981.
 
 
 3
 Claimant testified that his primary medical problem was constant pain in his left knee and upper leg. Although he has twice undergone arthroscopic surgery and various physical rehabilitation programs, he testified that his knee still swells up if he walks more than half a block without resting. Although he can drive a car with an automatic transmission, he must stop every 30 miles to rest and elevate his leg. Claimant stated that he cannot stand for more than 20 minutes and cannot sit for more than 45 minutes to an hour without elevating his leg. He testified that he spends approximately 10 hours a day sitting in a reclining chair with his left leg elevated, and that this helps keep the swelling down. Claimant wears a knee brace all the time and, since November 1983, has used a transcutaneous electrical nerve stimulator (TENS) unit to help relieve the pain. He further testified that, with the exception of brief respites following both surgeries, his pain has gotten steadily worse since the accident and, in fact, gets worse as each day progresses. Claimant had not been on pain medication throughout most of this period due to problems with stomach ulcers. Finally, claimant testified that any activity (other than sitting with his left leg elevated) for extended periods of time aggravates the pain and swelling and therefore, while he was willing to try sedentary work, he doubted that he would be able to work any job that did not permit him to elevate his leg.
 
 
 4
 Claimant also alleged disability due to chest pain, though he did not testify to this during the hearing. He was examined by Dr. Catherine Harris in regard to this matter in November of 1983. Dr. Harris concluded that claimant's chest pain was musculoskeletal in origin, not cardiac-related, and that use of the TENS unit should help to relieve it.
 
 
 5
 At the hearing, after posing some questions to the claimant, James Englekes, Ph.D., a certified vocational expert (VE), characterized claimant's past relevant work experience as semiskilled in nature and involving medium to heavy exertional requirements. In response to the Administrative Law Judge's (ALJ's) hypothetical question, assuming that the claimant could only perform work which allowed him to have his left leg elevated in a straight-out position on a more-or-less continuous basis, the VE testified that he would be unable to find work in competitive employment that would accommodate those restrictions. However, the ALJ posed an alternative hypothetical. Assuming he found claimant able to perform sedentary work with a sit/stand option, taking into consideration his work skills and educational background, the VE testified that there were approximtely 22,500 semi-skilled and unskilled jobs in the lower peninsula of Michigan (claimant's region) that claimant could perform. This figure represented less than 10% of the 300,000 sedentary positions in the same geographical area.
 
 
 6
 In our opinion, the most relevant evidence concerning claimant's impairment comes from the records and reports of the various treating physicians. Immediately following claimant's accident in December 1981, he was treated by Jerome Conrad, M.D., an orthopedic surgeon. Dr. Conrad's early notes reveal that claimant's left leg had been immobilized in a cast for a short period after the injury and that X-rays taken on December 29, 1981, January 19, 1982, and February 12, 1982, show proper healing of the fractured patella. Claimant complained of pain in the knee area throughout the early months and an inability to contract his quadricep in January. He was given some pain medication and instructed to exercise his knee and leg without the knee splint. Claimant was again seen in Dr. Conrad's office on March 11, 1982, at which time he again complained of pain and an inability to lead with his left leg when climbing stairs. "Moderate effusion" of left knee was noted but this was apparently not inconsistent with healing fractures. He had normal flexion-extension of his left leg and was urged to "be a little more aggressive with his exercises."
 
 
 7
 Dr. Conrad's notes of the March 30, 1982 office visit state that:
 
 
 8
 The patient is still using his immobilizer part-time, occasionally. He still has occasional pain in the suprapatellar pouch area. There is no effusion today. He has excellent motion from 0-130?. He has good stability but he does have weak quads. He is instructed that he really has to make his quads strong. If he does not noone [sic] else can. He understands that. From my standpoint he can return to work as of 04-05-82. I will see him again on a PRN basis.
 
 
 9
 (Tr. 122). On June 17, 1982, claimant was still "complaining bitterly of pain in his knee." He recounted an incident to Dr. Conrad of attempting to work on a car and his knee swelled up. The Doctor's relevant notes state:
 
 
 10
 The patient says the knee hurts and he just has had difficulty getting back to work and has not got a job. Exam reveals a healthy appearing male who has no effusion in either knee. He has no crepitus noted. He has full motion from 0-130?....
 
 
 11
 ....
 
 
 12
 I talk to the patient and explain I do not have an answer for all his pain.... We will send him to phsyical therapy and do Cybex testing of his knee....
 
 
 13
 X-rays today are essentially unremarkable.
 
 
 14
 (Tr. 123).
 
 
 15
 On August 20, 1982, Dr. Conrad's examination notes reveal that claimant had no effusion and virtually full range of motion, "but any real motion causes pain." The Doctor was distressed by the results of the Cybex testing--claimant had a 20 to 30 per cent defect in the power, strength and endurance of the quads and hamstrings. "The patient has regressed to the point where is is wearing a Pro knee support ... and is now even using a cane." Dr. Conrad "recommend[ed] at this point that we stop physical therapy and stop the cane and just allow him to use his knee within his symptoms." The Doctor did, however, note the physical therapist's observation that there may be a "mechanical abnormality" limiting the rehabilitation and accordingly advised the claimant of the availability of a bone scan, an arthroscopic evaluation, and/or a second opinion. Ten days later, patient was told that the bone scan showed "nothing that was really suprising." There was still no effusion and no crepitus.
 
 
 16
 On August 31, 1982, claimant was referred to the University of Michigan hospital for a second opinion. On September 2, X-rays of the left knee were again normal. Claimant was examined on October 5, 1982, by Herbert Kaufer, M.D., and William Ward, M.D., orthopedic surgeons at the University. Dr. Ward noted that the knee was stable and in anatomic alignment, had full active and passive range of motion, and full active extension. He also observed one and one-half inch atrophy of the left thigh with "well marked subjective pain." Drs. Kaufer and Ward concluded that the etiology for claimant's condition remained unknown but recommended a "vigorous physical therapy program" to rehabilitate the quads and hamstring muscles.
 
 
 17
 Claimant did, in fact, resume physical therapy after this second opinion with "minimal progress." Dr. Conrad's final notation was made on November 18, 1982:
 
 
 18
 The patient is now 11 months post patellar fracture. He is no better than he was. He has had vigorous physical therapy with 26 outpatient visits. He is about the same as he was before he went to Ann Arbor. He comes in walking with a cane and with a PRO knee brace on. He has atrophy noted. He has full motion but he has difficulty on terminal extension because he says it catches. He has no effusion today and really very minimal crepitus.
 
 
 19
 When everything is said and done, I explain to the patient he has mostly pain and no objective physical findings. I really have nothing further to offer him. I recommend that he try and get rid of his cane, try and get rid of his brace and stop his Physical Therapy and just go ahead and live his life. He should accept the discomfort he is having and get along with life as best as possible. He understands that this is one approach. Another approach would be to look inside arthroscopically with no guarantee that anything could be found or fixed. The patient understands my thoughts that he has symptoms but no signs. I will see him again on a PRN basis.
 
 
 20
 (Tr. 125).
 
 
 21
 Claimant underwent his first arthroscopic surgery on January 19, 1983, in Grand Rapids, Michigan. The surgeon, Walter Braunohler, M.D., performed a partial synovectomy, removing a portion of the inflamed and adhesive synovial tissue. Claimant testified at the hearing that he had temporary relief after this procedure. He was seen by Dr. Braunohler on March 28, 1983, and July 1, 1983. The Doctor's notes from these examinations reveal that claimant was again complaining of pain in the knee area and an inability to walk or climb stairs. After the first examination, Dr. Braunohler doubted that claimant would ever be able to return to his previous employment as a heavy equipment operator, but stated that "[h]e should be able to perform a job that requires 80% sitting and 20% walking," starting out at half days.
 
 
 22
 Dr. Braunohler performed a second arthroscopic surgery on August 25, 1983. Once again, a partial synovectomy was performed and two large plicas were removed. On September 16, 1983, Dr. Braunohler completed a physical capacities evaluation of claimant indicating inter alia that, in his opinion, his patient could complete an 8-hour workday if allowed to sit for 8 hours and stand for 1 hour, and would not require any special rest periods. Dr. Braunohler's notes throughout this period are similar to those of Dr. Conrad--observing that claimant had good range of motion and minimal crepitus but continued with complaints of subjective pain and still had atrophy of the thigh muscles. The doctor suggested various exercises to build up these muscles.
 
 
 23
 Apparently the only other doctor to examine the claimant during this period was Dr. Ramer, for the Michigan Department of Social Services. Dr. Ramer's rather cryptic notes of his May 1983 examination state, in relevant part:
 
 
 24
 Musculoskeletal/Extremities: knee--pt expresses pain to exam--resists full flexion stating its too painful....
 
 
 25
 Mental or Emotional Abnormality (Describe): Seems to be over-reacting, screaming and writhing in pain during knee exam--clenches teeth and shakes.
 
 
 26
 (Tr. 142).
 
 II.
 A.
 
 27
 After summarizing the testimony and medical evidence recounted above, the ALJ conceded that "there is no real question but that the claimant has had considerable difficulty with his left knee; also, he has not had the capacity to perform his past work because of his knee." Claimant's attorney had argued that claimant met the listed impairment in section 1.13 of 20 C.F.R. Sec. 404, Subpart P, Appendix 1 (1986), which required a finding of "disabled" if the following was shown:
 
 
 28
 Soft tissue injuries of an upper or lower extremity requiring a series of staged surgical procedures within 12 months after onset for salvage and/or restoration of major function of the extremity, and such major function was not restored or expected to be restored within 12 months after onset.
 
 
 29
 Id. In response to this argument, the ALJ stated that, after reviewing all the evidence, "it is apparent that claimant was not sufficiently deprived of the major function of his left leg for a sufficient period of time to meet the requirements of said section." The ALJ then specifically found that the claimant had met the special earnings requirements of the Act for all relevant periods, but that:
 
 
 30
 claimant's subjective complaints of pain and limitation have been considered herein; insofar as he alleges that he has been prevented from performing sedentary work with a sit and stand option for 12 continuous months, said complaints are found to be not credible.
 
 
 31
 (Tr. 15). He also found that claimant was a younger individual, a high school graduate, and had relevant work skills that were transferrable to other semiskilled, sedentary jobs. Therefore, using Vocational Rules 201.28 and 201.29 of 20 C.F.R. Sec. 404, Subpart P, Appendix 2, Table 1 (1986), "as a guide and considering the requirements of the jobs cited by the vocational expert, which jobs exist in significant numbers in the area of claimant's residence," the ALJ determined that claimant was not and had not been under a disability as defined in the Act.
 
 B.
 
 32
 The district court issued a written opinion granting the Secretary's motion for summary judgment. After reviewing the evidence in the record, it concluded that there was substantial evidence supporting the ALJ's determination that claimant was not disabled within the meaning of the Act. Specifically, it noted that claimant's two treating physicians, Conrad and Braunohler, had not considered claimant unable to engage in any and all substantial, gainful activity, only that he was unable to perform his past employment. The district court did not specifically address claimant's argument with respect to the section 1.13 impairment.
 
 III.
 
 33
 Review of the district court's affirmance of the Secretary's decision to deny disability or SSI benefits is limited to determining whether there is substantial evidence to support the Secretary's decision. "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive...." 42 U.S.C. Sec. 405(g) (1982). Substantial evidence must be " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). In determining whether the evidence is substantial, the court must consider the entire record, including that which "fairly detracts" from the weight. Wages v. Secretary of HHS, 755 F.2d 495, 497 (6th Cir.1985) (per curiam). The ALJ's findings of fact became the Secretary's when the Appeals Council allowed the decision to stand as the final decision of the Secretary.
 
 IV.
 
 34
 The Secretary has promulgated a sequential process for evaluating disability claims under the Act. 20 C.F.R. Sec. 416.920 (1986). This circuit has characterized this process as involving five steps. If at any of the first four steps a clear finding can be made that claimant is either "disabled" or "not disabled," that finding is dispositive and the evaluation process is terminated. If not, then the disability determination is made at the fifth and final stage. The five steps are:
 
 
 35
 (1) The Secretary determines whether the claimant is currently engaged in substantial gainful activity. If so, claimant is not disabled.
 
 
 36
 (2) The Secretary examines the severity of claimant's impairment. If the impairment is not severe and does not significantly limit the ability to perform basic work activities, claimant is not disabled.
 
 
 37
 (3) The Secretary compares claimant's impairment to the "Listing of Impairments" in 20 C.F.R. Sec. 404, Subpart P, Appendix 1. If claimant's impairment meets or equals one of the listed impairments, claimant is found to be disabled.
 
 
 38
 (4) The Secretary next determines whether claimant is able to perform his/her past work. If so, claimant is not disabled.
 
 
 39
 (5) If necessary, the Secretary considers claimant's residual functional capacity and the transferability of any skills the claimant may possess to determine whether claimant qualifies as disabled.
 
 
 40
 See Salmi v. Secretary of HHS, 774 F.2d 685, 687-88 (6th Cir.1985).
 
 
 41
 In the case at bar, the Secretary proceeded to the fifth step before finding that claimant was not disabled. In other words, in the first four steps the Secretary found that claimant was not engaged in any substantial activity at the time of the hearing; claimant's impairments (at least the left knee impairment) were severe; claimant's impairments did not meet or equal those listed in Appendix 1; but they did prevent him from returning to his previous employment as a heavy equipment operator. In the district court and on appeal, claimant only takes exception to the third of the first four determinations.
 
 A.
 
 42
 Claimant contends that the district court erred in its finding that there was substantial evidence to support the Secretary's conclusion that claimant's knee impairment did not meet or equal the impairment listed in section 1.13 of Appendix 1, supra. Claimant contends that the problem he was having with synovitis constituted a soft tissue injury of a lower extremity requiring a series of staged surgical procedures within 12 months after onset to restore the major function of the extremity and such major function was not restored within 12 months after onset. Assuming, as the Secretary appears to have assumed, that claimant's synovitis did constitute such a soft tissue injury, and further assuming that surgical procedures were required within 12 months of onset, the issue becomes whether substantial evidence in the record supports the Secretary's determination that claimant did not go without the "major function" of his left leg for a 12-month period.
 
 
 43
 In reviewing this determination, the following regulatory language is helpful:
 
 
 44
 Loss of function may be due to amputation or deformity. Pain may be an important factor in functional loss, but it must be associated with relevant abnormal signs or laboratory findings. Evaluations of musculoskeletal impairments should be supported where applicable by detailed descriptions of the joints, including ranges of motion, condition of the musculature, sensory and reflex changes, circulatory deficits, and X-ray abnormalities.
 
 
 45
 20 C.F.R. Sec. 404, Subpart P, Appendix 1, Section 1.00(A) (1986). Claimant relied heavily on testimony of subjective pain to support his claim of loss of major function of the left leg. The only objective medical sign of long duration that buttressed claimant's assertion of disabling pain is the noted atrophy of his left thigh. However, even this is tenuous support. The muscle atrophy is due directly to lack of exercise, and only indirectly (if at all) to pain in the knee. Any other objective medical signs that supported claimant's assertion of pain (i.e., effusion, crepitus, restricted range of motion) were of brief duration. This relative absence of objective explanation for claimant's pain is well documented in the record and is strong evidentiary support for the ALJ's determination that claimant's testimony regarding disabling and/or limiting pain was not credible. Accordingly, we find that the Secretary's determination that claimant's impairment did not meet or equal the impairment listed in section 1.13 is supported by substantial evidence.
 
 B.
 
 46
 Claimant next challenges the Secretary's step five determination that, given his residual functional capacity, education and transferable skills, he could perform a substantial number of sedentary jobs. Actually, claimant challenges this determination on two points: whether there was substantial evidence to support the determination that claimant had the residual functional capacity to perform certain sedentary jobs; and, assuming there was, whether the Secretary properly employed the "grid" to determine that a substantial number of such jobs exist in the national economy. With respect to the former issue, claimant made his prima facie case of disability by establishing that he was unable to perform his former work. At that point, the burden shifted to the Secretary to establish that claimant retained the residual functional capacity to perform work that existed in the national economy. Lashley v. Secretary of HHS, 708 F.2d 1048, 1054 (6th Cir.1983); Bowie v. Harris, 679 F.2d 654, 655 (6th Cir.1982).
 
 
 47
 The crux of the Secretary's step five determination was, of course, the credibility of the claimant's testimony regarding pain and the necessity for him to keep his left leg elevated on a fairly continuous basis. Since claimant had little objective medical evidence to corroborate his assertion of disabling pain, the opinion of his treating physicians, Conrad and Braunohler, are even more important than usual. See Lashley, 708 F.2d at 1054.
 
 
 48
 It is clear from the administrative record that neither treating physician considered claimant's pain serious enough to preclude him from any and all substantial, gainful employment for any continuous 12-month period. Conrad's notes of March 30, 1982, reveal that he considered claimant well enough to return to work as of April 5, 1982--less than four months after the accident. Again on November 18, 1982, Conrad told claimant that he had "mostly pain and no objective findings," and that he should discard his cane and brace, "accept the discomfort he is having and get along with his life as best as possible." [Emphasis added.] Likewise, Braunohler opined on both March 28, 1983, and September 16, 1983, that claimant could perform ordinary work with a sit/stand option with minimal physical restrictions. Neither treating physician ever indicated that claimant was totally disabled from all work due to his knee. In fact, neither physician ever indicated that claimant needed to elevate his left leg for any significant period of time. Given the telling evidence from claimant's own treating physicians and the relative absence of objective medical evidence corroborating or even explaining claimant's pain, we hold that the ALJ was completely justified in finding that claimant's testimony on his pain and limitations lacked credibility. Therefore, the Secretary's step five determination of residual functional capacity was supported by substantial evidence in the administrative record.
 
 C.
 
 49
 The final issue raised by claimant regards the Secretary's use of the grid in determining that a substantial number of such jobs exist. Claimant argues that it was error as a matter of law for the ALJ and the Secretary to rely on Vocational Rules 201.28 and 201.29 of 20 C.F.R. Sec. 404, Subpart P, Appendix 2, Table 1, because the evidence indicated that claimant could only perform sedentary work with a sit/stand option. This restriction limited him to less than the full range of sedentary employment. Since claimant's characteristics did not exactly match those set forth in the grid, the Secretary is, in fact, precluded from treating the grid classifications as dispositive in this instance. See Kirk v. Secretary of HHS, 667 F.2d 524, 540-41 (6th Cir.1981).
 
 
 50
 Nevertheless, the administrative record makes clear that the ALJ did not "rely" on the grid; instead, he posed hypotheticals to a vocational expert on the availability of jobs for a person with claimant's transferable skills, education and varying degrees of impairment. Such consultation with a VE is in keeping with SSR 83-12 (quoted in Wages, 755 F.2d at 498). After the ALJ found that claimant's assertion of pain was not credible, he also found that he had the capacity to perform sedentary work with a sit/stand option. Then, using Vocational Rules 201.28 and 201.29 "as a guide," and considering the testimony of the VE concerning the availability of jobs, he found claimant was not disabled under the Act. This is exactly the type of procedure that is supposed to be following in such cases. See Wages, 755 F.2d at 498.
 
 V.
 
 51
 Because the Secretary's determination that claimant was not disabled under the Act was supported by substantial evidence in the administrative record, and because the ALJ followed the proper procedure in making this determination, the district court's grant of the Secretary's motion for summary judgment is AFFIRMED.